UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALIN CHRISTOPHER PROPHETE,

                     Plaintiff,

v.                                          Case No. 3:20-cv-514-BJD-LLL

LT. STERLING PEUGH, et al.,

                     Defendants.

_____

## **ORDER**

### I.    **Status**

Plaintiff, an inmate in the Florida Department of Corrections (FDOC),[1] is proceeding on a pro se Fourth Amended Civil Rights Complaint (Doc. 95; FAC) against Lieutenant Sterling Peugh, Captain Joshua Davis, Sergeant Quinton Williams, Officer Charles Bias, Sergeant Anthony Cruz, Sergeant Willie Oliver, Captain John Hood, and Officer Lyndell Hampton. Plaintiff raises claims of excessive force and failure to intervene, as well as a violation of due process.

_____

[1] According to the FDOC's website, Plaintiff is due to be released from custody on June 2, 2023. See Corrections Offender Network, available at http://dc.state.fl.us/offenderSearch/detail.aspx?Page=Detail&DCNumber=B07712& TypeSearch=AI (last visited Jan. 11, 2023).

Before the Court is Defendants' Motion for Summary Judgment (Doc. 160; Motion) with exhibits (Docs. 160-1 to 160-12; Def. Ex.). Defendants filed under seal three video DVDs of the handheld camera footage in support of their Motion (Doc. S-161; Def. Exs. I-1 to I-3), and as directed by the Court, an additional video DVD showing the fixed wing video footage and a copy of the FDOC's Security Operations Procedure 602.004 (Doc. S-172). The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56 and provided him with an opportunity to file a response. See Order (Doc. 7). Plaintiff filed a Response (Doc. 170; Response); a Declaration (Doc. 171), which includes some of Defendants' discovery responses and documents relating to the disciplinary report he received regarding this incident; and a Supplement (Doc. 167) with an attached second Declaration and some of Defendants' discovery responses and use of force incident reports.  The Motion is ripe for review.

## II.    Plaintiff's Allegations in the FAC

Plaintiff contends that on January 30, 2019, while housed at Union Correctional Institution, "Defendant Peugh sought and received authorization to supervise the use of chemical agents on Plaintiff by claiming Plaintiff was beating and yelling on his cell door." FAC at 10. Peugh also received permission "to use a forced cell extraction team." Id. Plaintiff acknowledges that at 9:59

2

a.m., "Peugh issued [him] a final order to cease all disruptive behavior," but Plaintiff contends that he was not being disruptive. Id. at 5; see also id. at 10. Instead, Plaintiff claims that "Peugh lied on Plaintiff in order to manipulate use of force procedure to unjustifiably use force on Plaintiff." Id. at 5. Due to Plaintiff's compliance, the handheld camera was turned off at 10:03 a.m., and all staff exited the wing. Id.

Around 10:07 a.m., "without any justifiable reason, . . . Peugh returned with the camera" and other staff members. Id. Peugh directed Officer Amit to administer three one-second bursts of chemical agents into Plaintiff's cell. Id.

At approximately 10:20 a.m., Peugh returned to Plaintiff's cell and "asked if [Plaintiff] wanted to submit to hand restraint and strip search procedure[s]." Id. Plaintiff said he did, but "instead of opening the handcuffing portal of Plaintiff's cell to conduct a strip search, Defendant Peugh ordered [Officer] Amit to administer [a second round of] three (3) one (1) second burst[s]" of chemical agents into Plaintiff's cell. Id. at 5-6.

At 10:30 a.m., Peugh returned to Plaintiff's cell with other correctional staff, including a five-man cell extraction team "comprised of Defendants Hampton, Williams, Bias, Cruz, and Oliver." Id. at 6. Plaintiff agreed to comply with strip search and hand restraint procedures, "[h]owever, the use of force camera was manipulated by the Defendants of the cell extraction team, under

3

the order and direction of Defendant Peugh, to make it appear as if [Plaintiff] was not complying when, in fact, [he] was." Id. Under Peugh's supervision, Officer Amit administered a third round of three one-second bursts of chemical agents into Plaintiff's cell at 10:32 a.m. Id.

Around 10:40 a.m., Peugh and the cell extraction team returned to Plaintiff's cell and "asked if [he] was going to submit to strip search and hand restraint procedures," to which Plaintiff "complied." Id. Nevertheless, Plaintiff alleges that Peugh ordered the use of force camera to be manipulated "to make it appear as if [Plaintiff] was not complying when, in fact, [he] was." Id. at 6-7. Around 10:43 a.m., the cell extraction team, along with Defendant Peugh, breached Plaintiff's cell, and for the "the next two to three minutes[,] Plaintiff was physically and sexually assaulted by Defendants Hampton, Bias, Williams, Cruz, Oliver, and Peugh." Id. at 7.

Plaintiff alleges that before his cell was breached, he placed his "mattress on the floor directly in front of the cell door and [he] was laying face down, while naked, when the cell was breached." Id. According to Plaintiff, Defendants continually yelled, "stop resisting," even though he did not resist. Id. He contends that during the entire time, he "was actually being physically beaten with close[d] fist and handcuffs and sexually assaulted with the leg irons." Id. Plaintiff elaborates:

> I was beaten in the head with the h[an]dcuffs which were used as brass knuckles. My penis and testicles were repeatedly struck with close[d] fist and shackles. I was also hit in the head with closed fist. All of this occurred while I was naked because I had surrendered by boxers in compliance with strip search procedure moments earlier. Also, while being p[i]nned down on my stomach[,] my anus was penetrated several times by the open end of the shackles before the[y] were put on my ankles.

Id. at 7-8. He further claims that Peugh "grabbed [his] penis." Id. at 9. He asserts that during this entire time, Defendants Hood, Davis, and Oliver were present but failed to intervene in the assault. Id. at 8-9.

Plaintiff asserts that on April 6, 2019, Peugh "threatened to kill [Plaintiff] by manipulating D.O.C. procedure to get authorization to use force on Plaintiff." Id. at 9. According to Plaintiff, Peugh "specifically said the extraction team would not allow Plaintiff to submit to hand restraint and strip search procedure" and "they would beat [him] like they did last time, but this time they would kill [him] and that someone would block the camera." Id.

As a result of the force used on January 30, 2019, Plaintiff contends that he had "hematomas in both eye areas," "multiple lacerations to [his] head and penis as well as pain in [his] testicles." Id. at 11. He further asserts that his "blood pressure was increased" and he continues to have headaches. Id. He claims to have had blood in his urine, and "emotional pain and suffering and

severe mental anguish," along with depression. Id. He seeks $26 million in damages. Id.

### III.    Summary Judgment Standard

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014)[2] (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

## IV. Parties' Positions

First, Defendants argue that the video and documentary evidence show their actions were necessary to re-establish order and maintain discipline after providing Plaintiff with several warnings to cease his disruptive behavior. See Motion at 6-13. Second, as to Plaintiff's failure to intervene claims, Defendants contend that the video evidence "does not reveal the need for anyone to

---

[2] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

intervene on Plaintiff's behalf." Id. at 14. Third, Defendants assert they are entitled to qualified immunity. Id. at 15.[3]

In support of their position, Defendants submitted three DVDs (Def. Exs. I-1 to I-3), which show the video recordings from the handheld cameras. The first handheld video recording (Def. Ex. I-1) begins with an introduction from Defendant Peugh on January 30, 2019 at 9:56 a.m. Peugh states that Plaintiff has been creating a disturbance and refusing all orders to stop. Peugh advises that he and other correctional staff counseled Plaintiff, but Plaintiff continued to cause a disturbance. Peugh indicates that he received authorization from the duty warden to use chemical agents on Plaintiff if he refused the final order to comply. Peugh then approaches Plaintiff's cell and issues the final order to cease his behavior at 9:59 a.m. Peugh appears to leave the area, and Plaintiff can be seen and heard saying, in substance, "Hey Sterling Peugh, You're on my time, not your time. I'm going to let this camera leave and then I'll start another disturbance. You're on my time Sterling." The camera remains focused on Plaintiff's cell door for several minutes, where Plaintiff can be seen most of the time standing at the cell window. Peugh reapproaches Plaintiff's cell, announces the time as 10:03 a.m., and indicates that Plaintiff is now in compliance, so no further action will be taken at this time. Peugh, however,

---

[3] Defendants do not address Plaintiff's due process claim.

advises Plaintiff that the final order will not be given again for the remainder of the shift if Plaintiff resumes his disruptive behavior. Plaintiff verbalizes his understanding and the camera stops recording.

The second handheld video recording (Def. Ex. I-2) begins with Peugh advising that the time is 10:06 a.m. and while Plaintiff temporarily complied with the orders to cease his disruptive behavior, Plaintiff was now causing a disturbance again, so staff will administer chemical agents. Peugh and other staff approach Plaintiff's cell.[4] Plaintiff is initially seen at the window but then disappears from view, so the camera approaches the cell window to gain a view of Plaintiff, who is seen covering up with a blanket. The cell door opens slightly and three one-second bursts of chemical agents are administered into Plaintiff's cell at 10:07 a.m. The camera remains focused on Plaintiff's cell, where he occasionally can be seen walking back and forth. He approaches the window and states, in substance, that he has two fixed wing cameras facing his cell and he was not on the door. At one point, Plaintiff can be seen without his white t-shirt on anymore, and he tells the camera, in effect, that they are

---

[4] The fixed wing camera view (U Quad 2A) shows that prior to Peugh and correctional staff approaching Plaintiff's cell to administer chemical agents, another correctional staff member approached Plaintiff's cell at 10:05:55 a.m. and placed a chain around the handle of Plaintiff's cell and the handle on the cell next to him so that Plaintiff's cell door could not be opened fully. Peugh and other staff members approach Plaintiff's cell at approximately 10:06:35 a.m. to administer the chemical agents.

all on his time and this "s*it will never stop." He also refers to himself as "the undisputed heavy weight champion of the world" and appears to tell the camera operator to take off his mask. Peugh approaches Plaintiff's cell and asks him if he will comply. Then Peugh advises the camera that Plaintiff stated he would comply. However, Plaintiff then says, in effect, you know we're going to do this all day long, to which Peugh responds by telling Plaintiff to cease his threats and disruptive behavior. Plaintiff then says something inaudible followed by, in effect, I was going to get out.[5] Peugh reapproaches Plaintiff's cell, stating to the camera that Plaintiff was continuing to be disorderly and threatening staff. As such, a second round of three one-second bursts of chemical agents was administered into Plaintiff's cell at 10:20 a.m.

After several minutes, Peugh reapproaches Plaintiff's cell and asks Plaintiff if he will comply, to which Plaintiff responds that he will. Plaintiff is told to stay on the door and keep his hands on the glass, which he does with his middle fingers in the air. Peugh and the cell extraction team members approach Plaintiff's cell, and Plaintiff is advised to comply with strip search procedures while he remains in his cell. Peugh advises that Plaintiff is not being compliant, but Plaintiff yells multiple times that he is bending over. A

---

[5] Plaintiff acknowledges that he was being verbally threatening and abusive. <u>See</u> Response at 14 ("Peugh used Plaintiff's mere verbal threats and verbal abuse as a pretext to order the second application of chemical agents.").

third round of three one-second bursts of chemical agents was administered into Plaintiff's cell at 10:32 a.m. Plaintiff repeatedly yells through his cell window that he was compliant, bending over the whole time after they took his boxers, and that correctional staff are manipulating the situation to run the cell extraction team on him. At 10:42 a.m., Peugh announces that another camera is on scene to film the cell extraction, and this video concluded.

The third handheld video recording (Def. Ex. I-3) begins at 10:39 a.m., with Peugh providing a historical statement of the situation. The five members of the cell extraction team introduce themselves (Defendants Hampton, Williams, Cruz, Bias, and Oliver) and advise of their responsibilities during the extraction. Peugh and the team then approach Plaintiff's cell, and Plaintiff states he will comply. Plaintiff is directed to submit to a strip search properly. Plaintiff is directed to comply multiple times, and he can be heard saying that he is. The camera does not show Plaintiff inside of the cell.[6] Peugh announces that Plaintiff is refusing to comply and the cell extraction team prepares to enter his cell.

At approximately the 4:11 minute mark on the video recording, the cell door is opened, and the team and Peugh enter Plaintiff's cell. The cameraman

---

[6] Plaintiff was naked at this time. Over the course of this incident, the cameraman was directed to not film any nudity.

moves toward the front of the cell door. The correctional staff members repeatedly instruct Plaintiff to put his hands behind his back and to stop resisting. It appears Plaintiff is on the ground with the correctional staff members around him, but the camera view does not show what is actually happening on the ground nor does it show at all times the correctional staff members or Plaintiff. Around the 5:42 minute mark, Peugh announces that restraints are on and they are waiting to be given Plaintiff's boxer shorts so they can put those on Plaintiff. Around the 7:05 minute mark, Plaintiff is assisted to his feet, and around the 8:12 minute mark, he exits his cell. Plaintiff is escorted to the shower cell for a decontamination shower and he alleges on the video that he had a "PREA"[7] on Peugh because Peugh touched his penis. Peugh advises Plaintiff that it will be addressed. Plaintiff receives a decontamination shower and then is escorted to medical for a post use of force physical. He arrives at medical at 11:00 a.m. After being examined by medical staff, Plaintiff is escorted back to his decontaminated cell. By 11:06 a.m., Plaintiff is back in his cell and the video is concluded.[8]

---

[7] Prison Rape Elimination Act.

[8] While the fixed wing video (Doc. S-172; camera view U Quad 2A 0959) provides an overview of the wing and yelling can be heard after Peugh exits the wing the first time around 10:03 a.m., it is impossible from this camera view to determine whether Plaintiff was the one yelling or causing any other disturbance. The other fixed wing camera facing Plaintiff's cell (Doc. S-172; camera view U 2C) does not have audio and

Defendants also submitted Declarations. According to Defendant Peugh:

> On[] January 30, 2019, Inmate Alin Prophete #B07712, was creating a disturbance by beating on the cell door and refusing all orders to cease actions. Chemical agents were administered to bring him into compliance. Inmate Prophete was again ordered to submit to restraint procedures, to which he refused. Authorization was received to conduct a cell extraction. I supervised the cell extraction team. Inmate Prophete was again ordered to submit to restraint procedures, to which he refused. C.O. Hampton, C.O. Williams, Sgt. Cruz and C.O. Bias entered the cell and gained control of Inmate Prophete's extremities and restraints were applied. No further force was utilized.
>
> At no time did I witness anyone touch Inmate Prophete for the purpose other than placing restraints on him so that he could be removed from his cell.

Doc. 160-1 at 1 (paragraph enumeration omitted). Defendants Hampton (Doc. 160-4), Cruz (Doc. 160-5), Oliver (Doc. 160-6), Williams (Doc. 160-7), and Bias (Doc. 160-8) submitted nearly identical Declarations to Defendant Peugh, with the exception of adding that they did not touch Plaintiff other than for purposes of applying restraints.

Defendant Davis avers:

> At approximately 1007 hours, on Wednesday, January 30, 2019, while assigned as V-Dorm Administrative Lieutenant, I was present on Quad 2 in U-Dorm at which time I observed Officer Jennifer Amit

_____

does not show Plaintiff causing a disturbance before the first application of chemical agents.

> administer one application of OC Chemical Agents
> and one application of CS Chemical Agents into cell
> U2112L, which houses Inmate PROPHETE, Alin – DC
> #B07712. It should be noted that I was not present and
> did not witness the second application of chemical
> agents. I also witnessed Officer Lyndell Hampton,
> Sergeant Quinton Williams, Sergeant Anthony Cruz,
> and Officer Charles Bias enter . . . the cell and gain[]
> control of Inmate Prophete's extremities and
> restraints were applied. No further force was utilized.
>
> At no time did I witness anyone touch Inmate
> Prophete for the purpose other than placing restraints
> on him so that he could be removed from his cell.

Doc. 160-2 at 1 (paragraph enumeration omitted). Defendant Hood submitted a similar Declaration to Defendant Davis. See Doc. 160-3.

Defendants also submitted a report of force used (Doc. 160-10), Plaintiff's post use of force emergency room record (Doc. 160-11), and Plaintiff's relevant grievances and the responses thereto (Doc. 16-12). The medical record indicates that Plaintiff denied any pain, and he was not in any distress. Doc. 160-11. He had minimal swelling with a small bump on the outside top of his left eye, and the left side of his head had a small bump/hematoma. Id. He was advised to access sick call if needed. Id.

In Plaintiff's Response, he contends that genuine issues of material fact preclude entry of summary judgment for Defendants. To support his position, Plaintiff submitted a Declaration (Doc. 171) that largely mirrors the allegations in the FAC. He avers in pertinent part:

On January 30, 2019 at 9:59 A.M. defendant Peugh issued Plaintiff a final order to cease all disruptive behavior. To be clear, Plaintiff was not being disruptive, but defendant Peugh lied on the plaintiff in order to manipulate use of force procedure to unjustifiably use force on the plaintiff. . . .

At approximately 10:07 A.M., without any justifiable reason, Lt. Peugh returned with the camera and [three] officers . . . . Then under the direct supervision and order of defendant Peugh, Officer Amit administered three (3) one (1) second burst of O.C. Chemical agents . . . into plaintiff's cell. . . . This use of force was excessive and unnecessary because Plaintiff had not created a disturbance warranting its use.

At approximately 10:20 A.M. Defendant Peugh returned with officers Amit and Meston and asked if Plaintiff wanted to submit to hand restraint and strip search procedure[.] I said yes. However, instead of opening the handcuffing portal of plaintiff's cell to conduct a strip search, defendant ordered [Officer] Amit to administer three (3) one (1) second burst of C.S. chemical Agents . . . into Plaintiff's cell . . . . This use of force was excessive and unnecessary because the Plaintiff had agreed to submit to hand restraint and strip search procedure[s] but my handcuff portal was not opened to allow me to do so. Moreover, I did not create a disturbance that would have justified said force.

At approximately 10:30 A.M. Defendant Peugh returned with officers Meston and Amit as well as a five-man cell extraction team which was comprised of defendants Hampton, Williams, Bias, Cruz and Oliver. Upon being asked, I agreed to comply with strip search and hand restraint procedures. However the use of force handheld camera was manipulated by defendants of the cell extraction team, under the order

and direction of defendant Peugh, to make it appear as if the Plaintiff was not complying when, in fact, he was. . . . [A]t 10:32 A.M. under the direct supervision and order of defendant Peugh, [Officer] Amit administered three (3) one (1) second burst of C.S. Chemical Agents . . . into Plaintiff's cell. At this time all staff, except camera operator Ellis, exited the housing unit.

At approximately 10:40 AM Defendant Peugh returned along [with] the rest of the defendants. Defendants Hampton, Williams, Bias, Cruz and Oliver assembled in front of my cell and asked if I was going to submit to strip search and hand restraint procedures. I complied with these orders but the use of force camera was manipulated by the cell extraction team defendants under the order and direction of defendant Peugh to make it appear as if Plaintiff was not complying. . . . Thus at approximately 10:43 A.M. Plaintiff's cell was bre[a]ched and the cell extraction team, along with defendant Peugh[,] entered the cell. Over the next two to three minutes the Plaintiff was physically and sexually battered by defendants Hampton, Bias, Williams, Cruz and Peugh.

Prior to the cell being breached, I had laid my state issued mattress on the cell floor directly in front of the cell door and I had laid down on it and was naked when the cell door was breached. I offered no resistance during the cell extraction but the audio of the handheld camera was manipulated by the defendants who yelled on audio "stop resisting" and similar statements multiple times to drown out my screams for help and the noise of the battery that was occur[r]ing. The defendants also yelled these statements to unlawfully attempt to create the appearance of a need for force. During the entire time defendants were screaming "stop resisting" the Plaintiff was actually being physically beaten with closed fists and handcuffs which were utilized as brass

knuckles and sexually battered by having the shackles pen[e]trating his anus. Plaintiff's penis and testicles were repeatedly struck with closed fists and the shackles. All of these actions occurred while I was naked because I had surrendered my boxers in compliance with strip search procedures moments earlier. Also, while being pinned down on my stomach Plaintiff's anus was penetrated several times by the open end of the shackles before they were put on his feet by a member of the cell extraction team. . . .

Along with the physical and sexual battery that occur[r]ed during the unnecessary and excessive cell extraction the Plaintiff suffered hematomas and lacerations to the back of his head and lacerations on his penis as well as pain in his testicles. . . .

Defendants Hood and Davis did not physically harm the Plaintiff [during] the incident but they are liable because they failed to intervene on the Plaintiff's behalf and protect him from physical and sexual battery that occur[r]ed during the cell extraction. Both Defendants – Hood and Davis – were present at Plaintiff's cell door during the cell extraction, saw what was occurring . . . and they acted as if nothing was wrong and yelled "stop resisting" and similar statements to create an appearance of a need for force which was in fact excessive and unnecessary. Defendant Oliver also is liable for failing to intervene on the Plaintiff['s] behalf. Defendant Oliver watched the entire cell extraction while blocking the view of the camera – for the duration of the physical and sexual battery – and did nothing to help the Plaintiff.

Doc. 171 at 1-6 (paragraph enumeration omitted). Plaintiff goes on to state that while he was being examined by medical staff, he attempted to report the sexual battery and abuse, but Peugh threatened him "with death threats." Id.

at 6. Plaintiff claims that Peugh admitted to grabbing Plaintiff's penis and ordering the extraction team members "to pen[e]trate the Plaintiff's anus with the shackles because the Plaintiff had been disrespectful" by voicing verbal threats and abuse. Id. at 6-7. Plaintiff further avers that months later, on April 6, 2019, Peugh threatened Plaintiff by claiming he would do what he did "the last time," but this time they would kill Plaintiff. Id. at 7.

Additionally, Plaintiff argues in his Supplement (Doc. 167-1) that Defendant Peugh manipulated the FDOC's use of force procedure to use force on Plaintiff. Plaintiff specifically contends that Peugh assembled the cell extraction team before it was warranted. Id. at 1. He claims that Peugh's actions in this regard show that the "use of [the] cell extraction [team] was predetermined and not based on a legitimate penological interest or need." Id. at 2.

## V.   Analysis[9]

### a.  Excessive Force and Failure to Intervene

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

---

[9] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

18

As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." Hudson v. McMillian, 503 U.S. 1, 5 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs based on the type of Eighth Amendment violation alleged. Id.

Since [the plaintiff] asserts excessive-force and sexual-assault claims, "the core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (citation and quotation marks omitted). This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8 (cleaned up).

With respect to the subjective element, "to have a valid claim on the merits of excessive force in violation of [the Eighth Amendment], the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a

19

> federal cause of action." <u>Wilkins</u>, 559 U.S. at 37. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Id.</u> at 37-38. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." <u>Id.</u> at 37 (citation and internal quotation marks omitted).

<u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1265-66 (11th Cir. 2020) (internal citations modified).

In determining whether an officer's use of force was applied maliciously and sadistically for the purpose of causing harm, courts consider five factors:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

<u>Campbell v. Sikes</u>, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986); <u>Hudson</u>, 503 U.S. at 7). Courts "must also give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a

disturbance.'" <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting

<u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)).

While a lack of serious injury is not dispositive, it is relevant to the

inquiry. <u>Wilkins</u>, 559 U.S. at 38; <u>Smith v. Sec'y, Dep't of Corr.</u>, 524 F. App'x

511, 513 (11th Cir. 2013) (per curiam).

> "[T]he extent of injury suffered by an inmate is one
> factor that may suggest 'whether the use of force could
> plausibly have been thought necessary' in a particular
> situation." <u>Ibid.</u> (quoting <u>Whitley</u>, 475 U.S. at 321).
> The extent of injury may also provide some indication
> of the amount of force applied . . . . An inmate who
> complains of a '"push or shove"' that causes no
> discernible injury almost certainly fails to state a valid
> excessive force claim. <u>Id.</u> at 9 (quoting <u>Johnson v.
> Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)).
>
> Injury and force, however, are only imperfectly
> correlated, and it is the latter that ultimately counts.
> An inmate who is gratuitously beaten by guards does
> not lose his ability to pursue an excessive force claim
> merely because he has the good fortune to escape
> without serious injury.

<u>Wilkins</u>, 559 U.S. at 37-38; <u>see</u> <u>Charles v. Johnson</u>, 18 F.4th 686, 700 (11th Cir.

2021) (citations omitted) ("A plaintiff who suffers only <u>de</u> <u>minimis</u> injury does

not necessarily lack a claim for excessive force under § 1983. However, the

resulting injuries can be evidence of the kind or degree of force that was used

by the officer.").

Here, the parties present two different stories. On the one hand, Defendants contend that the force used (chemical agents and cell extraction) was necessary because Plaintiff was causing a disturbance on the wing and being non-compliant with orders. On the other hand, Plaintiff swears that he was not causing a disturbance and he was complying with Defendants' commands. Plaintiff says the force used was excessive and unnecessary, and the sexual assault was wholly violative of his constitutional rights.

The video evidence is not as clear as Defendants suggest. <u>See</u> Motion at 10 ("The handheld videos contradict Plaintiff's allegations in nearly every aspect."). Indeed, the videos do not actually depict Plaintiff causing a disturbance before the first application of chemical agents (although he clearly states that he will wait for the camera to be turned off before being disruptive again), nor do they conclusively refute his contentions that he was complying with the orders given to him. In fact, contrary to Defendants' argument that the video shows them at all times during the cell extraction, <u>see</u> Motion at 11, a review of the video evidence shows otherwise. The Court is neither able to see each Defendants' actions while inside of the cell nor Plaintiff's compliance or lack thereof. The video evidence does not clearly depict what occurred inside the cell during the cell extraction. Thus, the Court cannot determine the amount or extent of force used during the cell extraction or whether any sexual

battery occurred. And although Plaintiff's documented injuries are not severe, he contends that he had other undocumented injuries.

The Court is faced with Plaintiff's sworn version of events and Defendants' sworn version of events, neither of which are wholly supported or contradicted by the videos or other documentary evidence. See Sears v. Roberts, 922 F.3d 1199, 1208 (11th Cir. 2019) (citation omitted) ("[A] plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."). It is not the province of the Court on summary judgment to weigh the evidence or make credibility determinations. See Sconiers, 946 F.3d at 1263 ("Summary judgment is not a time for fact-finding; that task is reserved for trial."); Sears, 922 F.3d at 1208-09; see also Rivera v. LeBron, 824 F. App'x 838, 842 (11th Cir. 2020) ("As a general rule, that kind of credibility determination is not appropriate at the summary judgment stage."). Moreover, "[a] guard who sadistically and maliciously forces his finger into an inmate's anus . . . plainly commits 'severe . . . sexual abuse of a prisoner' and violates the Eighth Amendment." Sconiers,

946 F.3d at 1266.[10] Considering the record in the light most favorable to Plaintiff, the Court finds genuine issues of material fact preclude entry of summary judgment on Plaintiff's excessive force claims.

Likewise, if a jury were to find Defendants' use of force violated the Eighth Amendment, the jury could also find that Defendants Hood, Davis, and Oliver failed to intervene. See Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) ("'[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" (quoting Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007))). Defendants again rely on the video evidence: "The video of the cell-extraction does not reveal the need for anyone to intervene on Plaintiff's behalf." Motion at 14. But, as stated above, the video is not as clear as Defendants suggest, and these Defendants, who were present at the scene, likely had a better view of what was occurring inside the cell than what can be seen on the video. The record evidence is contradictory, and

---

[10] Defendants attempt to distinguish Plaintiff's allegations from those in Sconiers by arguing: "[T]his is not a case of digital penetration. This is a case wherein Plaintiff alleges that he was penetrated with shackles, while wearing no boxers. A review of the video demonstrates that even if Plaintiff's allegations were true, Plaintiff cannot prove that the incident occurred intentionally nor does he allege that the incident occurred intentionally." Motion at 12. Defendants provide no legal authority supporting their argument that there is a difference between "digital penetration" and penetration with shackles. And whether one of the Defendants intentionally or unintentionally "penetrated several times [Plaintiff's anus with] the open end of the shackles" is not a question that can be resolved on this summary judgment record.

viewing the facts in the light most favorable to Plaintiff requires the Court to deny Defendants' Motion to the extent it seeks summary judgment on the failure to intervene claims.

### b. Qualified Immunity

The entirety of Defendants' argument regarding qualified immunity is "that there is no question that they were acting within their discretionary authority at all times during the allegations made in Plaintiff's complaint and were not aware of any violations of Plaintiff's constitutional rights." Motion at 15. Defendants did not individually analyze each Defendant's actions, nor do Defendants separately discuss the uses of force (applications of chemical agents and alleged physical/sexual force during the cell extraction). Plaintiff argues that he has established Eighth Amendment violations and thus Defendants are not entitled to qualified immunity. See Response at 26-27.

"The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. Alcocer v. Mills, 906

F.3d 944, 951 (11th Cir. 2018). In other words, "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

"To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." Gaines v. Wardynski, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted). If the defendant so shows, the burden shifts to the plaintiff to demonstrate that the defendant violated his constitutional rights and at the time of the violation, those rights were clearly established. Id. "Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

Here, Defendants were acting in the scope of their discretionary authority as correctional staff members at the time of the alleged incidents. Thus, Plaintiff must demonstrate that Defendants violated his constitutional rights and at the time of the violation, those rights were clearly established.

As found above, viewing the facts in the light most favorable to Plaintiff, as the Court is required to do, the Court finds that genuine issues of material fact preclude finding that Defendants are entitled to qualified immunity. Indeed, if a jury were to believe Plaintiff's version of events, the jury could reasonably find that Defendant Peugh violated Plaintiff's rights by ordering the use of chemical agents and that all Defendants violated Plaintiff's rights during the cell extraction.[11] As such, the Court concludes that Defendants are not entitled to qualified immunity.

In light of the foregoing, it is

**ORDERED**:

1.      Defendants' Motion for Summary Judgment (Doc. 160) is **DENIED**.

2.      Within **30 days** from the date of this Order, the parties shall confer in a good faith attempt to settle the remaining claims. The parties are encouraged to maintain a realistic approach in making and considering any settlement offers. If the parties resolve the case, they shall expeditiously file a notice in compliance with Local Rule 3.09(a). If they are unable to settle the

---

[11] The Court cannot individually analyze the actions of each Defendant with respect to the cell extraction because the parties' accounts vary significantly and the video evidence does not clearly depict the actions of each Defendant during the cell extraction.

case, they shall file a notice advising whether a settlement conference with a

United States Magistrate Judge may be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of

January, 2023.


_____

BRIAN J. DAVIS
United States District Judge




JAX-3 1/11
c:
Alin Christopher Prophete, #B07712
Counsel of Record

28